IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID D. JONES,<br><br>     Petitioner,<br><br>  vs.<br><br>J. SOTO, Warden, California State Prison,<br>Los Angeles County,[1]<br><br>     Respondent. | No. 2:09-cv-03022-JKS<br><br>MEMORANDUM DECISION |

David D. Jones, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254. David[2] is currently in the custody of the

California Department of Corrections and Rehabilitation and is incarcerated at the California

State Prison, Los Angeles County. Respondent has answered. David has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

The California Court of Appeal recounted the facts of this case as follows:

> Defendants Steven Allen Jones, Jr. and David Darrao Jones[FN1] appeal from the
> judgment of conviction after a jury found them guilty in count one of the first degree
> murder of John Jarvis ([California] Pen. Code, § 187, subd. (a)),[FN2] in count two of the
> attempted murder of Ian Michael Gonzales (664/187, subd. (a)) and in count three of
> robbery of both men. (§ 211.) The jury found true as to both defendants the special
> circumstance that the murder was committed in the commission of a robbery (§ 190.2,
> subd. (a)(17)) and the sentence enhancement that a principal was armed with a firearm.
> (§ 12022, subd. (a)(1); Counts 1, 2, and 3.) As to Steven, the jury further found the
> murder and the attempted murder were willful, deliberate and premeditated (§§ 189/664,

---

[1]   J. Soto, Warden, California State Prison, Los Angeles County, is substituted for
Francisco Jacquez, former Warden, Pelican Bay State Prison. FED. R. CIV. P. 25(c).

[2]   The petitioner is referred to by his first name for reasons discussed by the
California Court of Appeal, *infra*. This Court means no disrespect.

subd. (a)), that he personally and intentionally discharged a firearm proximately causing great bodily injury or death to Jarvis and Gonzales (§ 12022 .53, subd. (d); Counts 1, 2 and 3) and personally inflicted great bodily injury on Jarvis and Gonzales.  (§ 12022.7, subd. (a); Counts 2, 3.)

> FN 1.  Although defendants have the same family name, they are not related.  In the interests of clarity we shall refer to them by their given names.  We mean no disrespect.

> FN 2.  All further section references are to the [California] Penal Code unless otherwise specified.

Steven was sentenced to prison for life without the possibility of parole, plus 75 years to life.[FN3]  David was sentenced to prison for life without the possibility of parole plus 11 years.[FN4]

> FN 3.  Steven was sentenced to prison for life without the possibility of parole for first degree murder (§§ 187, 190.2, subd. (a)(17)), plus a consecutive life term for the attempted murder (§§ 664/187), and three consecutive terms of 25 years to life, one for the section 12022.53 (§ 211), one for the section 12022.53, subdivision (d) enhancement associated with count one and one for the section 12022.53, subdivision (d) enhancement associated with count two.  The sentences on the remaining enhancements were stayed.

> FN 4.  David was sentenced to prison for life without the possibility of parole for first degree murder (§ 187/190.2, subd. (a)(17)), plus consecutive terms of seven years for attempted murder (§ 187/664, subd. (a)), three years for robbery (§§ 211, subd. (c), 213, subd. (a)(2)), and one year for the arming enhancement on count three. (§ 12022, subd. (a)(1).)

. . . .

## FACTUAL BACKGROUND

In a nutshell, the murder and attempted murder resulted from a drug deal gone bad.  The evidence shows that defendant David agreed to buy four pounds of marijuana from John Jarvis and Ian Michael Gonzales for $12,000.  Instead, he stole the marijuana from the back of Jarvis's truck and then jumped into a waiting getaway car occupied by defendant Steven and two other cohorts.  Jarvis and Gonzales pursued the getaway car in Jarvis's truck, repeatedly ramming the car, which eventually spun around and knocked the truck into a ditch.  After the truck was immobilized, Steven exited the car and shot the two men, killing Jarvis and wounding Gonzales.  As both defendants challenge the sufficiency of the evidence in several respects, we set forth the facts in some detail.

**The Prosecution's Evidence**
**A. The Trip to Eureka**

      Leon Flanagan of Richmond met Steven in August or September 2003.  Steven was in a rap group and introduced himself to Flanagan as "Steve O."  In late September, the two men spoke about driving to Eureka where a well-known Bay Area rapper was performing and Flanagan was planning to perform at an after-party at Club West.  They planned to drive to the concert and Flanagan arranged to use his father's green Ford Taurus.  His friend, James Gordon, agreed to drive because Flanagan did not have a driver's license.

      In the late afternoon on Saturday, November 1, 2003, Flanagan and Gordon drove to Steven's residence and picked him up along with David, who was also a member of Steven's rap group.  Gordon was driving, Flanagan was sitting in the front passenger seat, and Steven and David were seated in the back seats.  By the time they arrived at Club West in Eureka, they were told it was too late to perform, so the foursome stayed awhile and then checked into a motel for the night.

**B. The Marijuana Deal**

      Gonzales lived in Trinity County and grew and sold marijuana.  On November 1, he went with some friends to the rap concert in Eureka.  The concert ended around midnight and Gonzales and his friends decided to go to the after-party at Club West.  While they were standing in line smoking marijuana, they met a group of three or four African-American men from the Bay Area who were interested in buying about five pounds of marijuana for approximately $15,000.  One of them was David, to whom Gonzales spoke to for about an hour outside the club.  Before leaving, Gonzales told the men to contact him at his home around noon the following day.

      The next morning on November 2, 2003, Gonzales had several telephone conversations with Jarvis who needed money and wanted to sell some marijuana.  It was agreed that Jarvis would sell David four pounds of marijuana and that he would receive $11,000 and Gonzales would receive $1,000 or $1,200.  The Bay Area men telephoned Gonzales around 10:30 or 11:00 a.m. and told him they had the money, so he arranged to meet them at a rest stop on Highway 299 near Salyer.

      Jarvis and his girlfriend, Devon Owen, picked Gonzales up in Jarvis's pick-up truck and headed to the rest area to meet the buyers.  The marijuana was in a large garbage bag in the back of Jarvis's truck.  Because Jarvis and Gonzales did not know the buyers, it was decided that Gonzales's father, William Thurman, would drive separately to the rest area to monitor the sale.  Thurman took a .30-30 deer rifle with him and he and Gonzales took radios to communicate.  Thurman arrived at the rest stop, parked his Blazer, and busied himself by making minor repairs on the vehicle while he waited for Jarvis and Gonzales to arrive.

      Meanwhile, after stopping at a gas station to buy gas, defendants and their two friends decided to take Highway 299 so they could drive Gordon to Vallejo where he lived.  They drove for awhile and then stopped at a rest stop in Salyer where they all used the restroom and the telephone.  Flanagan wanted to leave but Steven indicated that he was waiting for someone to arrive so he could buy some marijuana.  After waiting a few

minutes, they started to leave but then saw Gonzales arrive in Jarvis's truck.  The two vehicles pulled into adjacent parking spaces, although Gordon backed the Taurus into the space.  Jarvis and Owen walked over to the restrooms while Gonzales spoke with David, showed him the marijuana, and smoked some of it with him.  David told Gonzales he wanted to go to another location to conduct the transaction because they had been at the rest area too long and Gonzales suggested a secluded road a short distance away.

Gonzales walked over to Jarvis and Owen to tell them about the plan and while they were talking, Owen saw David get out of the Taurus and hesitate.  Then she heard several voices coming from the Taurus yelling "Just do it.  Go get it.  Just do it.  Just do. Get it."  David walked around the back of the car, grabbed the bag of marijuana from the back of Jarvis's truck, ran back to the Taurus, and entered the passenger side of the car.

Meanwhile, Jarvis and Gonzales ran toward the Taurus, which had began to move.  Jarvis grabbed a hold of David's shirt trying to retrieve the marijuana and grabbed onto the door frame as David jumped into the moving car.  Hoping to stop the car, Gonzales stepped in the path of the Taurus but moved aside when it became apparent the car was not going to stop. As the Taurus sped up, Jarvis lost his footing and was dragged 10 to 12 feet until the door closed on his hand and he let go and rolled away.  The Taurus left the rest area and Jarvis and Gonzales ran to the pickup truck to pursue them and Thurman followed them.

## C. The Vehicle Chase

The Taurus and the pick-up truck drove east on Highway 299 and when Jarvis caught up with the Taurus, he rammed the back of it several times hoping to stop the car and retrieve his marijuana.  Gordon continued driving and at Steven's direction, turned onto Denny Road where Gonzales signaled them to pull over but Gordon proceeded across a bridge as Jarvis continued ramming the back of the car.

The vehicles drove down Denny Road until they came to a hairpin turn.  Steven was holding a gun out the window and had been firing it at Jarvis's truck. The truck rammed the Taurus again, which caused the Taurus to spin around and knock the truck into a ditch.  After pulling out of the ditch and hitting the Taurus again, the truck fell back into the ditch and was immobilized.  The Taurus stalled and came to a stop about 10 or 12 feet past the truck.  While Gordon attempted to restart the car, Steven got out, and retrieved something from the trunk.[FN5]  He then walked towards the disabled truck, where holding a gun double-handed, [he] fired five shots into the truck, paused and fired another series of shots.  He walked briskly back to the car and said "Get me out of here. Get me out of here.  Please get me out of here" and Gordon drove back towards the bridge.

> FN 5.  One eyewitness testified that he saw someone holding a pistol outside the rear driver's side window of the Taurus as the Taurus and the truck went by. Another eyewitness testified that she saw an African-American man holding a gun as he exited the back seat of the Taurus on the driver's side.

Gonzales was hit twice in the back but was able to check on Jarvis who was losing consciousness and died within minutes from wounds caused by a single bullet.

Meanwhile, Gonzales radioed his father and told him Jarvis had been killed. He warned Thurman that the Taurus was heading his way. Thurman stopped his Blazer on the other side of the bridge and blocked the road. As the Taurus headed toward him, Steven waived a pistol at Thurman who stood behind the door of his vehicle and fired a bullet through the radiator of the Taurus.

Gordon stopped the car and refused to drive any more, so Steven changed places with him, tossing a revolver into the river before getting into the driver's seat. Steven then turned the car around and sped back up Denny Road passing Jarvis's truck and the assembly of people who had gathered to assist Jarvis. About one or two miles up the road, one of the tires blew out and Steven pulled the Taurus into a small turn out on the side of the road.

When Flanagan walked away from the car to make a call from his cell phone, David and Steven pushed the Taurus off a steep embankment and then fled taking the bag of marijuana, which had been in the back seat in their possession. Gordon and Flanagan wandered around the area until 5:40 p.m. when they were picked up and arrested by Trinity County Sheriff's deputies about one mile from the crime scene.

**D. The Investigation**

A criminalist processed the Taurus for evidence. He collected clothing, cigarette butts, and a sample of fabric from the back seat closer to the driver's side where he observed a red stain.

A few days after the crime, the Trinity County Sheriff's Department recovered the gun that Steven had thrown into the river. It was a .38 caliber Smith and Wesson revolver that held six shells and contained five expended cartridges and one empty cylinder. The ballistic evidence showed the bullet recovered from Jarvis's body was a .38 caliber bullet consistent with the revolver recovered from the river but results from a comparison of the bullet and the weapon were not conclusive.

During a police interview on November 10, 2003, Gonzales identified Gordon and Flanagan from photographic lineups as two of the men in the Taurus.

By the beginning of December, the Sheriff's Department had Steven's and David's first names but were unable to locate them over the next few months. On January 8, 2004, a Richmond police officer spotted David seated in a vehicle. After detaining and searching him, he found 18 clear plastic baggies of marijuana in David's possession. The next day, when Detective Nawrock arrived to take David into custody and explained why he was there, David put his head down and cried.

On July 16, 2004, Flanagan spoke with Detective Nawrock and the prosecuting attorney. At that time, Flanagan identified Steven and David from photographic lineups and told them David had taken the marijuana and Steven was the shooter.

In 2004, Gordon was tried separately and convicted, and Flanagan was charged jointly with Steven and David. On May 3, 2005, Flanagan entered a negotiated plea in which he agreed to plead guilty to voluntary manslaughter and possession of a weapon

and receive a sentence of 10 years imprisonment in exchange for his truthful testimony at Steven's and David's trial.

DNA profiles were developed from the items collected from the Taurus, including the red stain on fabric taken from the back seat, a baseball cap, and a head wrap, and were found to match Steven's DNA profile.[FN6]

> FN 6.  The DNA profile from the blood stain matched Steven's DNA profile along 12 loci and the probability that a random unrelated individual would by chance possess this profile at 12 loci was estimated to occur in approximately one in 5.5 quadrillion African-Americans, Steven's ethnic group.  The DNA profile from the cap and head wrap matched Steven's DNA profile along 8 loci and the random chance of such a match was approximately one in 770 billion African-Americans.

The Trinity County Sheriff's deputies were unable to locate Steven until May 2004, when Detective Nawrock received information from the police in Auburn, New York that Steven had been in New York using the name Michael Dennis Griffith.  Later in the month, Nawrock was advised that Michael Dennis Griffith had had contact with the Nevada Police Department, whereupon Nawrock travelled to Nevada and took Steven into custody.

**The Defense**

Neither defendant testified but both called witnesses in support of alibi defenses. Steven's evidence showed that he signed in for a court-ordered domestic violence and anger management counseling group in El Cerrito at 6:00 p.m. on November 3, 2003, the day after the shooting.  He also presented evidence that no live performances had been planned for the Club West after-party.

Steven Raines, who was in jail with Steven and Flanagan in Trinity County, testified that Flanagan had told him Steven was being set up to take the fall for the crimes although he had not been present during the crimes.

David's evidence showed that on November 2, 2003, he picked up his son from his mother's home in Fairfield, took him to lunch, and brought him back around 2:00 p.m.  Afterwards, he attended a barbeque in Richmond.  He also presented the testimony of a forensic psychiatrist regarding factors that can affect memory and eyewitness identification.

*People v. Jones*, No. C052707, 2008 WL 2781153, at *1-5 (Cal. Ct. App. July 18, 2008).

On November 28, 2006, David filed a counseled appeal to the Court of Appeal.  David asserted that: 1) his convictions for felony murder and robbery must be reversed because there was insufficient evidence that he perpetrated a robbery, aided and abetted a robbery, or intended

to commit a robbery; 2) his conviction for attempted murder must be reversed because there was insufficient evidence to prove that he did anything to aid and abet the shooting from the car; 3) the felony murder special circumstance must be reversed because his single act of stealing the marijuana did not support the conclusion that he was a major participant in the robbery that arose out of his theft, or that he acted with reckless indifference of human life; and 4) the trial court committed sentencing error when it sentenced him to robbery in addition to first-degree felony murder and attempted murder.

The Court of Appeal agreed that the trial court erred in sentencing David for both the attempted murder and robbery and ordered that the robbery sentence be stayed. *Jones*, 2008 WL 2781153, at *22-24. The court also *sua sponte* stayed the attendant armed enhancement and ordered that the abstract of judgment be modified accordingly. *Id*. at 24. The court otherwise affirmed the judgment of conviction in a reasoned opinion dated July 18, 2008. *Id*.

On August 26, 2008, David filed a counseled petition for review to the California Supreme Court, arguing that his convictions for felony murder and robbery must be reversed because there was insufficient evidence to prove that he perpetrated a robbery, aided and abetted a robbery, or intended to commit a robbery, and that his conviction for attempted murder must be reversed because there was insufficient evidence to prove that he did anything to aid and abet the shooting from the vehicle. On October 28, 2008, the California Supreme Court summarily denied review. On January 13, 2009, David filed a petition for writ of certiorari with the United States Supreme Court, which the Supreme Court denied on May 26, 2009.

On October 26, 2009, David filed a *pro se* petition for writ of habeas corpus with the superior court, arguing that: 1) trial counsel was ineffective for failing to investigate a five-day

gap between his arrest and arraignment; 2) trial counsel was ineffective for failing to file a

motion to suppress Gonzales's identification of him from a photo array because the photo was a

warrantless search and seizure; 3) law enforcement committed misconduct by altering evidence;

4) trial counsel was ineffective for failing to renew a motion for a change of venue because he is

an African-American and there were very few African-Americans in the County of Trinity,

where he was tried; 5) trial and appellate counsel "did not address the change of venue" and the

trial court failed to engage in comparative juror analysis; 6) trial counsel was ineffective for

refusing to allow him to testify at trial; 7) jurors saw him transported to the courthouse in

shackles and prison clothing; and 8) the prosecutor committed misconduct by mentioning five

times in closing argument that David failed to take the stand in his own defense.

On December 4, 2009, the superior court denied David habeas relief, concluding that the

case law David cited did not support his claim that he was impermissibly transported to the court

in shackles or forced to appear at pretrial hearings in shackles and in prison clothing, and he did

not make a claim that he was unlawfully restrained at trial or forced to stand trial in prison

clothing.  The court further concluded that his remaining claims "refer to documents including

the record in the case, all of which would appear to be reasonably available but were not

included with his petition," and that David "failed to set forth diligent efforts to obtain the

documents."[3]

---

[3]     The court did not cite any case law for this proposition.  In general, the California
Supreme Court does not require that a petition include competent proof of every allegation.
However, it has stated that a petition should "state fully and with particularity the facts on which
relief is sought" and "include copies of *reasonably available* documentary evidence supporting
the claim, including pertinent portions of trial transcripts and affidavits or declarations."  *People
v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995) (citations omitted and emphasis added).
"Conclusory allegations made without any explanation of the basis for the allegations do not

Also on October 26, 2009, the same day David filed his petition for writ of habeas corpus with the state superior court, David filed his Petition for Writ of Habeas Corpus with this Court. He raised the same claims that he unsuccessfully raised in his superior court petition, and additionally argued that his first-degree murder charge and robbery charges were not supported by legally sufficient evidence and that there was no evidence that he aided and abetted.  David acknowledged that eight of his ten claims for relief were unexhausted, and requested that this Court hold the Petition in abeyance pending exhaustion of his state court remedies.

On March 12, 2010, this Court, through a previously assigned magistrate judge, ordered Respondent to submit a response addressing David's request for a stay and abeyance. Respondent subsequently filed a motion to dismiss the Petition and an opposition to stay and abeyance.

On November 16, 2010, this Court, through a previously assigned district judge, stayed the instant action pending exhaustion of state court remedies as to David's first eight claims for relief on the ground that David had established "good cause" because he "exercised due diligence in his efforts to obtain his file" and because he filed his superior court habeas petition, as well as the instant action, which contained two fully exhausted claims, within the AEDPA's one-year filing deadline.  The Court ordered David to file an exhaustion petition with the California Supreme Court within thirty days of the entry of the order and to file a motion to lift the stay within thirty days from the date the California Supreme Court resolved his exhaustion petition.  The Court denied the motion to dismiss and administratively closed the case.

_____

warrant relief, let alone an evidentiary hearing."  *Id*. (citation omitted).

In the meantime, while his motion before this Court for a stay and abeyance was pending, David filed a petition for writ of habeas corpus with the California Court of Appeal.  In papers dated August 26, 2010,[4] David raised the eight unexhausted claims that he had raised in his habeas petition to the superior court as well as a ninth claim that trial counsel was ineffective for failing to request an instruction on lesser included offenses of robbery because he lacked the intent to commit a robbery.  The Court of Appeal summarily denied relief on September 23, 2010, prior to this Court's November 16, 2010, order granting David's motion for a stay and abeyance and requiring him to file an exhaustion petition within thirty days.

David did file an exhaustion petition for writ of habeas corpus with the California Supreme Court, but he did not file it within thirty days of this Court's November 16, 2000, order directing him to do so.[5]  In his exhaustion petition, David raised the eight unexhausted claims that he had raised in his habeas petition to the superior court and Court of Appeal, including the following claims: 1) trial counsel was ineffective for failing to investigate a five-day gap between his arrest and arraignment; 2) trial counsel was ineffective for failing to file a motion to suppress Gonzales's identification of him from a photo array because requiring him to sit for the photo used in the array was a warrantless search and seizure; 3) law enforcement committed misconduct by requiring him to pose for a photo showing his teeth after Gonzales could not identify David in the first photo array and by altering the dates of the photos; 4) trial counsel was

---

[4]        David originally filed his petition with the Court of Appeal on June 22, 2010, but filed it with the wrong court.  He then filed it with the correct court on August 26, 2010.

[5]        It is unclear exactly when it was filed.  David dated his exhaustion petition March 11, 2011.  The front page of the petition is stamped as "received" on both April 27, 2011, and May 11, 2011.  The California Supreme Court docket states that it was filed on May 11, 2011. David's exhaustion petition was late by any of these dates.

ineffective for failing to renew a motion for a change of venue because David is an African-American and there were very few African-Americans in the county where he was tried; 5) trial and appellate counsel "did not address the change of venue" and the trial court failed to engage in comparative juror analysis; 6) trial counsel was ineffective for refusing to allow him to testify at trial; 7) jurors saw him transported to the courthouse in shackles and prison clothing; and 8) the prosecutor committed misconduct by mentioning five times in closing argument that David failed to take the stand in his own defense.  David also re-raised the claim that he raised for the first time in his petition for habeas relief to the Court of Appeal that trial counsel was ineffective for failing to request an instruction on lesser included offenses of robbery because he lacked the intent to commit a robbery.  David did not argue, as he did in his original Petition before this Court and which this Court deemed exhausted, the claim that his first-degree murder charge and robbery charges were not supported by legally sufficient evidence and that there was no evidence that he aided and abetted.  Rather, he argued that there was insufficient evidence that he harbored the specific intent to sustain his conviction for attempted murder.  David additionally raised the following new claims: 1) there was "an actual breakdown in the adversarial process"; 2) trial counsel experienced blackouts and memory lapses, "exhibiting . . . a pattern of intoxication and typical behavior of drugs or drinking or stress to the point of diminished capacity"; 3) counsel failed to secure "a race-neutral jury"; 4) trial counsel failed to address his claim that the prosecution had "alter[ed] know[n] documents"; 5) trial counsel was ineffective for failing to "investigate and introduce at trial evidence central to [his] defense"; 6) trial counsel failed to file a motion to sever his trial from Steven's trial; 7) trial counsel was ineffective for failing to request an "*Evans* Lineup," and appellate counsel was ineffective for failing to argue on direct

appeal that trial counsel should have requested such a line up; 8) the trial court erred in failing to issue "lesser-included offense and specific intent element instructions"; 9) the prosecutor challenged potential jurors on the basis of their race in violation of *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), and trial counsel was ineffective for failing to file a *Batson* motion protesting those race-based challenges; 10) where trial counsel "was silent, made no objections, filed no motions, and requested no explanation with respect[] to no African-American jurors while his own client was African-American," the trial court had a *sua sponte* obligation to "conduct an inquiry as to comparative jury analysis"; 11) counsel failed to request six jury instructions; 12) the trial court failed to *sua sponte* instruct the jury "on the lesser included offense of involuntary manslaughter/criminal negligence"; and 13) the cumulative errors committed at trial by the trial court and his counsel warranted reversal of his convictions.  The California Supreme Court denied the petition on November 16, 2011.

David did not comply with this Court's order requiring him to file a motion to lift the stay after the California Supreme Court entered a decision on his exhaustion petition.  Instead, David filed a new Petition on December 15, 2011, which this Court construed as a new action and assigned to it a separate case number.  After Respondent notified the Court of this error, the Court consolidated the two actions and construed David's new Petition as a motion to lift the stay and ordered Respondent to file a response.  Respondent filed a statement of non-opposition to the motion to lift the stay, but noted that David had failed to file his exhaustion petition with the California Supreme Court within thirty days of this Court's November 16, 2010, order.

On May 25, 2012, the Court granted the motion to lift the stay.  The Court also ordered Respondent to file a response to David's Amended Petition.  Respondent answered on November 16, 2012.

## II. GROUNDS RAISED

David's arguments in his Amended Petition before this Court correspond to the arguments he raised in his exhaustion petition to the California Supreme Court—namely, he argues that: 1) trial counsel was ineffective for failing to investigate a five-day gap between his arrest and arraignment; 2) trial counsel was ineffective for failing to file a motion to suppress Gonzales's identification of him from a photo array because the taking of the photo was a warrantless search and seizure; 3) law enforcement committed misconduct by requiring him to sit for the second photo and by altering evidence; 4) trial counsel was ineffective for failing to renew a motion for a change of venue because David is an African-American and there were very few African-Americans in the county where he was tried; 5) trial and appellate counsel "did not address the change of venue" and the trial court erred in failing to engage in comparative juror analysis; 6) trial counsel was ineffective for refusing to allow him to testify at trial; 7) jurors saw him transported to the courthouse in shackles and prison clothing; 8) the prosecutor committed misconduct by mentioning five times in closing argument that David failed to take the stand in his own defense; 9) counsel was ineffective for failing to request an instruction on theft as a lesser included offense of robbery; 10) there was "an actual breakdown in the adversarial process"; 11) trial counsel experienced blackouts and memory lapses; 12) counsel failed to secure "a race-neutral jury"; 13) trial counsel failed to address his claim that the prosecution had "alter[ed] know[n] documents"; 14) there was insufficient evidence that he

harbored the specific intent to convict him of attempted murder; 15) trial counsel was ineffective for failing to "investigate and introduce at trial evidence central to [his] defense"; 16) trial counsel failed to file a motion to sever; 17) trial counsel was ineffective for failing to file a motion requesting an "*Evans* Lineup," and appellate counsel was ineffective for failing to argue on direct appeal that trial counsel should have requested such a lineup; 18) the trial court erred in failing to issue "specific intent element instructions"; 19) the prosecutor challenged potential jurors on the basis of their race in violation of *Batson*, 476 U.S. at 86; 20) trial counsel failed to make a *Batson* motion to challenge those race-based strikes; 21) where trial counsel "was silent, made no objections, filed no motions, and requested no explanation with respect[] to no African-American jurors while his own client was African-American," the trial court had a *sua sponte* obligation to "conduct an inquiry as to comparative jury analysis"; 22) trial counsel failed to request six jury instructions; 23) the trial court erred in failing to instruct the jury "on the lesser included offense of involuntary manslaughter/criminal negligence"; and 24) the cumulative errors committed at trial by the trial court and his counsel warrant reversal of his convictions.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden

of "showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

David has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no reply filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

### A.    Timeliness

David's Amended Petition raises new claims not originally raised in his original, timely Petition to this Court.  On July 18, 2008, the Court of Appeal affirmed David's judgment of conviction as modified by its order, *Jones*, 2008 WL 2781153, at *24, and the California Supreme Court denied David's appeal on October 28, 2008.  David's petition for writ of certiorari was denied by the United States Supreme Court on May 26, 2009.  David's judgment became final for purposes of establishing whether his new claims are timely under the AEDPA's one-year statute of limitations on May 26, 2009.  28 U.S.C. § 2244(d)(1)(A) (the one-year statute of limitations period for filing a federal habeas corpus petition "shall run from the latest of . . . the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review"); *Lawrence v. Florida*, 549 U.S. 327, 333-34 (2007) (§ 2244(d)(1)(A)'s reference to "direct review" includes the time for seeking review by the United States Supreme Court through a petition for writ of certiorari); *Wixom v. Washington*, 264

F.3d 894, 897 (9th Cir. 2001) (a judgment becomes "final" for purposes of triggering the

AEDPA's one-year statute of limitations either by the conclusion of direct review by the highest

court, including the United States Supreme Court, or by the expiration of time to seek such

review). The one-year statute of limitations began running the following day, on May 27, 2009,

*Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (calculating the AEDPA's one-year

limitations period according to Federal Rule of Civil Procedure 6(a)), and expired on May 26,

2010, excluding any time statutorily tolled. David filed his original Petition with this Court on

October 26, 2009, and it was therefore timely.

The filing of a petition for habeas corpus in federal court does not toll the statute of

limitations for federal habeas relief. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). A stay and

abeyance of a mixed petition, as was granted here, allows a petitioner to return to state court to

exhaust the claims that were unexhausted in his original petition. *Id*. at 275-76. Once the

petitioner exhausts his state court remedies, the district court will lift the stay and allow the

petitioner to proceed in federal court as to the newly and previously exhausted claims. *Id*. Any

newly-exhausted claims which were not raised in the original petition must either be timely in

and of themselves or "relate back" to the claims in the original petition. *Mayle v. Felix*, 545 U.S.

644, 656-59 (2005). Amendments to the original petition made after the statute of limitations

has run relate back to the original pleading if the claims in the original and amended pleadings

arise out of the same "conduct, transaction or occurrence." *Id*. at 655 (quoting FED. R. CIV. P.

15(c)(2)). The applicable test is whether the original and newly-asserted claims are united by a

"common core of operative facts." *Id*. at 659 (citations omitted). "An amended habeas petition

. . . does not relate back . . . when it asserts a new ground for relief supported by facts that differ

in both time and type from those the original pleading set forth." *Schneider v. McDaniel*, 674

F.3d 1144, 1150 (9th Cir. 2012) (quoting *Mayle*, 545 U.S. at 650)).

The AEDPA's one-year statute of limitations is tolled during periods in which a

"properly filed" habeas corpus petition is "pending" in the state court.  28 U.S.C. § 2244(d)(2).

The time during which a state application is "pending" includes the interval between a lower

court's denial of collateral relief and the filing of an original petition in a higher state court if the

prisoner complied with state timeliness requirements in proceeding from the lower court to the

higher court.  *Evans v. Chavis*, 546 U.S. 189, 191-93 (2006).  In California, an original petition

filed in a higher court is timely if it is filed within a "reasonable time" after the lower court's

denial of collateral review.  *Id.* at 192-93.  The Ninth Circuit recently commented on the

"reasonable time" standard:

> California's use of the "reasonableness" standard has prompted the United States
> Supreme Court to note that it is "more difficult for federal courts to determine just when
> a review application (*i.e.,* a filing in a higher court) comes too late." [*Carey v. Saffold,*
> 536 U.S. 214, 223 (2002)].  The Supreme Court has suggested that "the California courts
> themselves might alleviate the problem by clarifying the scope of the words 'reasonable
> time' in this context or by indicating, when denying a petition, whether the filing was
> timely.  And the Ninth Circuit might seek guidance on the matter by certifying a question
> to the California Supreme Court in an appropriate case." *Chavis,* 546 U.S. at 199.  To
> date, however, "California courts have given scant guidance as to what the State
> considers a 'reasonable' length of time to file an application for review." *Velasquez v.
> Kirkland,* 639 F.3d 964, 968 (9th Cir. 2011).  Until such guidance is provided, the
> Supreme Court has instructed federal courts to apply a thirty-to-sixty-day benchmark for
> California's "reasonable time" requirement, and courts in this circuit have developed a
> large body of case law which follows that instruction.  *Id.* (collecting cases).

*Stewart v. Cate*, ___F.3d___, 2014 WL 1707033, at *4 (9th Cir. May 1, 2014) (footnotes

omitted).  California generally accepts a 30-to-60-day delay as reasonable, but also permits delay

beyond that length of time if the petitioner can establish "good cause" for the delay.  *Id.*; *see also*

*Velasquez*, 639 F.3d at 968 (absent an "adequate explanation," gaps of 91 days and 81 days were unreasonable).  In the absence of a clear indication by the state supreme court that a petition is untimely, as is the case here, the federal court "must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness." *Chavis*, 546 U.S. at 198.

Here, Respondent concedes that the one-year statute of limitations was statutorily tolled between the time David filed his first petition for habeas relief with the superior court on October 26, 2009, and the superior court's denial of relief on December 4, 2009.  David is also entitled to interval tolling between the superior court's December 4, 2009, denial of his petition for habeas relief and the filing of his petition with the Court of Appeal if the interval was "reasonable."  David, however, did not file his petition with the California Court of Appeal until August 26, 2010, 266 days after the superior court denied him relief, which is far beyond the 30-to-60-day delay generally considered reasonable by California courts. *See Stewart*, 2014 WL 1707033, at *4.  David did not address timeliness in his Amended Petition and did not respond to Respondent's answer.  He has asserted no explanation, much less good cause, for the lengthy delay.

Nevertheless, this Court previously found that David established "good cause" for a stay and abeyance because the superior court had rejected habeas relief on the ground that he had failed to support his claims with documents from the record and that, dating back to early 2009, he had "exercised due diligence in his efforts to obtain his [case] file" which he needed to continue to pursue his claims in the state courts.  David received his trial file, including his

transcripts, some time in July of 2010,[6] and filed his petition with the Court of Appeal on August 26, 2010.  Whether David filed his petition with the Court of Appeal within a reasonable time after his claims were rejected as unsupported by the superior court is a close question which this Court will resolve in David's favor given that he is proceeding *pro se*.  David is therefore entitled to tolling for the entire period from October 26, 2009, when he filed his superior court habeas petition, through September 23, 2010, when the Court of Appeal denied his petition, for a total of 333 days.  This extends the one-year AEDPA statute of limitations from May 27, 2010, to April 24, 2011.

It is not clear when David filed his exhaustion petition with the California Supreme Court.  That court's docket sheet shows that David filed his petition on May 11, 2011, and if this Court were to go by that date, all of David's new claims exhausted in his supreme court petition, which he subsequently raised in his Amended Petition to this Court, would be untimely.  Those new claims would therefore be subject to "relation back" analysis before they could be considered on the merits by this Court.  However, this Court is obligated to give David the benefit of the "mailbox rule" and assume that he "filed" his petition on March 11, 2011, the date he signed it and presumably turned it over to prison authorities.  *See Anthony v. Cambra*, 236 F.3d 568, 574-75 (9th Cir. 2000) (citing *Houston v. Lack*, 487 U.S. 266, 275 (1988)).  Therefore, the new claims he raised in his exhaustion petition and raised again in his Amended Petition to this Court are timely and will be addressed on the merits.

---

[6]    According to David, the file he received in July of 2010 contained "over eighteen thousand pages of transcripts . . . and police discovery[,] four banker boxes of research and personal notes, and many exhibits."

B.      Merits

1.      *Strickland* ineffective assistance of counsel standard of review

David's Amended Petition is permeated with ineffective assistance of counsel claims.  To

demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must

show both that his counsel's performance was deficient and that the deficient performance

prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a reasonable

probability that the outcome might have been different as a result of a legal error, the defendant

has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86

(2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.

Thus, David show that defense counsel's representation was not within the range of competence

demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for

counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S.

52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make

a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697

(courts may consider either prong of the test first and need not address both prongs if the

defendant fails on one).

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:
> The question "is not whether a federal court believes the state court's determination"
> under the *Strickland* standard "was incorrect but whether that determination was
> unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is
> a general standard, a state court has even more latitude to reasonably determine that a
> defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

2.      Delay in arraignment (Claim 1)

David first argues that his trial counsel was ineffective for failing to investigate a 5-day gap between his arrest and his arraignment.  He additionally claims that a detainer was not in place and trial counsel failed to investigate "this violation of agreement on detainers."  David raised this claim in his petition for habeas corpus relief filed with the superior court.  The superior court denied relief, concluding that David had failed to support this claim with documentary evidence.  The Court of Appeal and California Supreme Court denied habeas relief on this claim without comment.

According to the record before this Court, David was arrested on January 8, 2004, in Richmond, California, pursuant to a Trinity County warrant.  Either the same day or the following day, David was taken into custody by the Trinity County police and transported to Trinity County.  It appears, although it is not entirely clear, that David was arraigned in Trinity Court on January 14, 2004.  Under California Penal Code § 825(a)(1), a "defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays."  California Penal Code § 821 provides that under some circumstances, if the defendant was arrested on a warrant in a county other than where the crime was committed and bail is not an issue, the law enforcement agency

requesting the arrest must take custody of him within five days and take the defendant before a

magistrate.  "Section 821 does not authorize a 5-day delay in all cases, but, rather, places a limit

upon what may be regarded as a necessary delay in a case where [the] defendant has been

arrested in another county; and a detention of less than five days, if unreason[ab]le under the

circumstances, would be a violation of the statute."  *People v. Combes*, 363 P.2d 4, 8 (Cal.

1961).

It is not clear if there was a violation of California Penal Code §§ 821 and/or 825 because

the warrant is not part of the record and the circumstances of David's arrest and arraignment are

also not clear from the record.  Even assuming that such a violation occurred, trial counsel was

not ineffective for failing to "investigate" and raise the issue, such as through a motion to

dismiss the charges prior to trial or moving to reverse after conviction, because such efforts

would have been futile.  In California, non-compliance with the statutory time limits for

arraignment goes to the legality of the detention, not the legality of the prosecution, and does not

constitute grounds for dismissal of the charges prior to trial.  *People v. Valenzuela*, 150 Cal.

Rptr. 314, 315-16 (Cal. Ct. App. 1978).  When pre-arraignment delay is asserted as a ground for

reversal *after* conviction, "a defendant's right to be taken before a magistrate within the time

specified by the law does not require a reversal unless he shows that through such wrongful

conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof."  *Id*. at

316 (quoting *Combes*, 363 P.2d at 7).  The state court would not have granted dismissal on

grounds of pre-arraignment delay prior to trial, and David has not asserted any prejudice which

would have warranted reversal on that ground after his conviction.  Trial counsel will not be

deemed deficient for failing to raise any delay in David's arraignment because such a claim

would not have been meritorious.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999)  (to

show prejudice under *Strickland* from failure to file a motion, petitioner must show that (1) had

counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious,

and (2) had the motion been granted, it is reasonable that there would have been an outcome

more favorable to the petitioner); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (counsel

was not deficient for failing to take futile actions); *see also Miller v. Keeney*, 882 F.2d 1428,

1434-35 (9th Cir. 1989) (counsel's failure to raise a weak issue did not constitute ineffective

assistance).  David thus cannot prevail on his claim that his trial counsel was ineffective for

failing to assert, either prior to trial or after his conviction, that his arraignment was

unreasonably delayed under California law.  *See Schoppe-Rico v. Horel*, No. C 07-5416, 2010

WL 4722476, at *9 (N.D. Cal. Nov. 15, 2010) (rejecting petitioner's claim that counsel was

ineffective for failing to move to dismiss a charge on the grounds that he was not arraigned

within the time required by California law because "noncompliance with the speedy arraignment

statutes goes to the legality of the detention, not the legality of the prosecution, so [it] is not

grounds for dismissal of charges under California law" (citing *Valenzuela*, 150 Cal. Rptr. at 315-

16)); *Johnson v. Mendoza-Powers*, No. EDCV 06-00893, 2008 WL 5245991, at *7 (C.D. Cal.

Dec. 12, 2008).

David also argues that "there was *never* a detainer placed on [him]," and counsel was

ineffective for "failing to investigate this violation of agreement on detainers."  In support of his

argument, David cites *United States v. Hach*, 615 F.2d 1203 (8th Cir. 1980), a § 2255 case in

which the petitioner claimed, *inter alia*, that his indictment should be dismissed because the

government failed to comply with the Interstate Agreement on Detainers Act.  *Hach*, however, is

distinguishable because David was not transferred between states, but rather between counties within the State of California, and the Act was inapplicable to him.  Trial counsel was not ineffective for failing to investigate or raise this meritless issue.  *Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim).  David therefore cannot prevail on this claim.

       3.       Claims related to the second photo array (Claims 2, 3, 13 & 17)

At trial, Detective Nawrock testified that on November 10, 2003, he showed Gonzalez a six-pack photo array including a photo of David, but Gonzales did not identify anyone from the array as having been involved in the incident.  Detective Nawrock testified that Gonzales told him that "if [the detective] had other pictures, maybe something showing more of David Jones's face, maybe his teeth, he might have a better opportunity at identifying [David]."  On January 21, 2004, Detective Nawrock showed Gonzales another six-pack photo array containing a "more recent" photo of David in which David is showing his teeth, and Gonzales identified David from that array.  Defense counsel did not move prior to trial to exclude Gonzales's identification of David from that photo lineup.

On cross-examination, Detective Nawrock testified that at the time Gonzales commented about seeing other photos of David, David was being held at the Shasta County Jail, so the detective "just sent down to them for another photograph, a more recent one."  Defense counsel asked if there had been "any specific request that [David] smile or show his teeth in [the second photo]."  Detective Nawrock could not recall "if there was anything specific or we wanted a more recent photograph of him.  They took the photograph.  I could have asked them that.  I just

don't recall that."  His report also did not indicate one way or another whether he had

specifically requested a photo of David showing his teeth.  In response to questioning by defense

counsel, Detective Nawrock testified that in the second photo array shown to Gonzales, two of

the photographs showed men with their mouths "firmly shut."  He could see some teeth in the

other four photographs.

At trial, Gonzales identified David as the person who grabbed the bag of marijuana.

Gonzales had spoken with David for about an hour on the evening prior to the drug deal, and

David was also the person he primarily dealt with on the day of the deal.  He smoked marijuana

with David on the day of the drug deal and the evening prior to the deal, where they talked for

about an hour while standing in line at a club.  After Gonzales and Jarvis chased down David

and his cohorts, one of the men brandished a gun and killed Jarvis and shot Gonzales twice in the

back.

Gonzales testified that when he was shown the second photo array on January 21, 2004,

he recalled stating that the photo of David "stands out in my mind and he has very similar traits"

and that he identified David at that time as "the one that grabbed the marijuana."  The

prosecution asked Gonzales how he was able to identify David from the second photo array

where he could not identify him from the first photo array.  Gonzales replied, "I don't know.  I

guess it just came back to me more."  Gonzales acknowledged that David was "smiling more" in

the second photo, and that that fact impacted his ability to identify David from the second photo

array.  Gonzales stated, however, that he was able to identify David in court because he "ha[d] a

recollection of him," and not because he had picked him out of the second photo array.  Gonzales

stated, "He just - - you don't forget people like that.  And like I say, after I seen a different picture of him, it did more justice."

On cross-examination, Gonzales testified that in his initial police interview he stated that one of the gentlemen he spoke with on the night prior to the drug deal had diamonds "or some kind of jewelry" in his teeth.  Gonzales testified that he could not recall whether, after he was shown the initial photo array, there was any discussion about obtaining a second photo of anyone.  Defense counsel then asked Gonzales about how he was able to identify David from the second photo array:

> [Defense counsel]:     And was it because of the teeth?
>
> [Gonzales]:     And it does a lot better justice in this photo.  It brings out more facial features due to him smiling.
>
> [Defense counsel]:     Did you ever see [sic] anything about the teeth of the man that you met at Yreka [sic], during your interviews?
>
> [Gonzales]:     Yes.  I believe I may have said he had gold teeth, I wasn't sure.

Defense counsel also cross-examined Gonzales about his subsequent criminal history and elicited from Gonzales that he had been "drinking pretty heavily" and smoking marijuana the evening prior to the drug deal.

Defense counsel called Dr. Martin Blinder, a forensic psychiatrist, to testify as an expert on eyewitness identification issues.  Without commenting on the reliability of any specific eyewitness, Dr. Blinder testified that people who smoke marijuana "have biological defects that prevent them from moving from short- to long-term memory."  He testified that other factors may also affect the memory of an eyewitness, including the presence of weapons during an incident, because the presence of weapons tends to absorb a disproportionate amount of

perceptual energy, and whether the eyewitness sustained a gunshot wound or other injury during

an incident.  In addition, according to Dr. Blinder, cross-racial identification is generally less

reliable than identification between people of the same race.  Dr. Blinder also testified that

memory fades with time, and that "an increase in [an eyewitness's] confidence [in identifying a

suspect] with the passage of time is suspect."

Dr. Blinder also testified that the manner in which photo lineups are conducted can affect

the quality of what an eyewitness remembers.  According to Dr. Blinder, some jurisdictions are

replacing six-pack photo lineups with the use of single, sequential photos, which forces an

eyewitness to compare each photo to his memory of the crime "rather than finding the one face

of six that might be most resembling of the fellow at the crime but not necessarily a good

match."  Defense counsel showed Dr. Blinder the first and second photo arrays which were

shown to Gonzales.  Dr. Blinder testified that in the second photo array, only two individuals

were showing their teeth.  Defense counsel continued:

> [Defense counsel]:  So if teeth [were] something to go by, there is really only two
> people with teeth to pick out of these six; is that - -
>
> [Dr. Blinder]:  Right.  It's what we would call a function lineup of two.  It would
> appear to be a lineup of six, but functionally it's two. . . . [T]he
> witness is being asked to . . . pick from one of two faces, not one
> of six, because the other four are immediately discounted.  And
> that's not an adequate test.  You need more than two choices in
> order for the eye lineup to be valid.

In summation, defense counsel highlighted Dr. Blinder's testimony regarding factors

which affect the accuracy of an eyewitness's identification of a suspect.  Defense counsel also

attacked Gonzales's identification of David from the photo array, arguing in part as follows:

> Mr. Gonzales is shown a lineup with [David] in it.  He can't pick anybody out.
> He says, "Show me some pictures of people with teeth or more smiling, more mouth,"

words to that effect.  They show him another lineup with [David], same spot, number four, five changes.  None of those people were involved in the earlier lineup.  And according to Dr. Blinder, who's a physician among other things, says you can only see teeth in two of those pictures.  So it's essentially a two-person lineup, because the other four aren't showing their teeth.

    . . . .

So if I understand the District Attorney's contention with regard to Mr. Gonzales and picking people out, if he looks at a photo lineup and my client, David Jones, is in it and he doesn't pick him out, that's okay.  If he looks at another one and does pick him out, that's okay too.  And if he picks out the wrong guy, Dwayne Williams, that's okay too.

David now argues, as he did in his petition to the superior court for habeas relief, that the police committed misconduct and "coerced [him] without a warrant or subpoena" to sit for the second photograph showing his teeth.  David additionally argues that trial counsel was ineffective for failing to move pursuant to California Penal Code § 1538.5 to suppress Gonzales's identification as the fruit of a warrantless search and seizure or to otherwise request an evidentiary hearing.  David likewise argues that a discrepancy in dates of the photos and accompanying discovery material demonstrate that the police "altered the evidence to fit [the crime]."  The superior court found that David failed to support these claims with documentary evidence.  The California Court of Appeal and Supreme Court summarily denied review of these claims.

David additionally argues that trial counsel was ineffective for failing to argue that the police altered the evidence, that trial counsel was ineffective for failing to request an "*Evans* Lineup," and that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel should have requested an "*Evans* Lineup."  David raised these claims for the first time in his exhaustion petition to the California Supreme Court, which that court summarily rejected.

The second photo was taken after David was in custody, and he does not challenge the lawfulness of that custody.  It is not clear from the record if the second photo was taken as a routine part of the booking process or was taken after David was booked at the request of Detective Nawrock.  It is not clear if Detective Nawrock requested that David smile or otherwise show his teeth.  Regardless, trial counsel would not likely have been successful in arguing that requiring David to sit for a second photo to be used in a photo lineup amounted to a warrantless search and seizure or otherwise violated David's constitutional rights.  In California, "[t]he protections afforded by the Fourth Amendment to persons not incarcerated generally are not applied in the same manner to persons held in lawful detention by the government." *People v. West*, 216 Cal. Rptr. 195, 197 (Cal. Ct. App. 1985).  A prisoner, including one merely suspected of a crime, has a reduced reasonable expectation of privacy which "specifically extends to that person's identity." *People v. King*, 99 Cal. Rptr. 2d 220, 226 (Cal. Ct. App. 2000).  The California Supreme Court has specifically held that "a defendant generally has no right to refrain from participating in a lineup." *People v. Hart*, 976 P.2d 683, 731-32 (Cal. 1999) (rejecting defendant's claim that counsel was ineffective for failing to move to suppress evidence obtained as a result of the defendant having been "coerced" by the police into participating in a post-arrest lineup); *see also Goodwin v. Superior Court*, 108 Cal. Rptr. 2d 553, 557 (Cal. Ct. App. 2001) (no court has found a due process right not to participate in a lineup); *West*, 216 Cal. Rptr. at 198-99 (as a result of the decreased expectation of privacy by inmates and the exigencies inherent in the prison environment, the government is not required to obtain a warrant or establish probable cause to conduct reasonable searches and seizures of inmates); *see also Rigney v. Hendrick*, 355 F.2d 710, 711-15 (3d Cir. 1965) (finding no violation of equal protection, due process, or the

right against self-incrimination where prisoners awaiting trial were required to participate in lineups to be viewed by victims of other, unrelated offenses).  Counsel was not ineffective in failing to argue that the police required a warrant to take the second photo, or that David's participation in the photo lineup otherwise violated his constitutional rights, because failing to raise such an argument would have been rejected by the trial court.  *Wilson*, 185 F.3d at 990; *Lockhart*, 506 U.S. at 374 (O'Connor, J., concurring).  David thus cannot prevail on his ineffective assistance of counsel claim.

David additionally states that he was the only one of six men in the second six-pack photo lineup "with teeth showing . . . and in jail clothing."  Construing his petition liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), David also appears to be arguing that trial counsel was ineffective for failing to move to suppress Gonzales's identification from the second photo array on the ground that the array was impermissible suggestive.  *See Goodwin*, 108 Cal. Rptr. 2d at 557 (although a defendant does not have a due process right to refrain from participating in a lineup, he does have a due process right to suppress evidence obtained at an impermissibly suggestive lineup).  Due process prohibits the admission of eyewitness identifications obtained after police have arranged identification procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *People v. Blair*, 602 P.2d 738, 750 (Cal. 1979) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  "In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances."  *People v. Carter*, 117 P.3d 476, 508-09 (Cal. 2005) (citations and

internal quotation marks omitted), *superceded by statute on other grounds as recognized in Verdin v. Superior Court*, 183 P.3d 1250, 1257 (Cal. 2008).

California courts have consistently held, however, that a photo array is not unduly suggestive merely because there are differences among the individuals shown in the photographs. *Blair*, 602 P.2d at 751 ("there is no requirement that a defendant in a lineup must be surrounded by people nearly identical in appearance" (citation omitted)); *see Carter*, 117 P.3d at 509 (six-pack photo array not unduly suggestive where defendant was the only individual wearing an orange shirt not otherwise identifiable as jail-issued clothing); *People v. Cunningham*, 25 P.3d 519, 561 (Cal. 2001) (rejecting challenge to photographic lineup where the defendant was the only one of the six men shown who had three of the features noted by the eyewitness—glasses, a goatee, and a suit and tie—where all of the others had glasses and a mustache, some had facial hair, and one wore a suit jacket); *People v. Johnson*, 842 P.2d 1, 16-17 (Cal. 1992); *supereceded by statute on other grounds as recognized in Verdin*, 183 P.3d at 1257 (photo array not unduly suggestive where defendant was the only one shown wearing a gold-colored prison-issued shirt and he was the only person who had been in the prior photo array).

The copy of the photo array submitted by David is of such poor quality that it is impossible to evaluate whether reasonable counsel would have moved to suppress Gonzales's identification as the fruit of an impermissibly suggestive photo lineup. The individuals certainly share some characteristics. However, David is showing the most teeth, although it is not clear if his teeth are distinctive in any way. In any event, David cannot establish that counsel's failure to do so prejudiced him. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one). At trial, defense

counsel vigorously undermined Gonzales's identification of David.  Counsel also presented Dr.

Blinder who pointed out problems that were relevant to Gonzales's identification of

David—including that he was under the influence of marijuana when he interacted with David

both on the evening prior to the drug deal and on the day of the drug deal, that Gonzales saw a

weapon and was shot twice during the incident, which would have distracted him from

accurately perceiving the suspects, that he claimed to recall David better in the second lineup,

which was "suspect," and that the identification was cross-racial and thus inherently less reliable.

Moreover, Gonzales claimed that he could identify David at trial based on his extensive

interaction with David on the evening prior to the drug deal and on the day of the deal, and not

from the photo lineup.  Given the high bar in establishing a photo lineup as impermissibly

suggestive and the fact that Gonzales was sure of his identification based on the fact that he had

spent a substantial amount of time with David, it was not unreasonable for counsel to elect to

attack Gonzales's identification through cross-examination and the introduction of expert

testimony rather than through a pretrial suppression motion.  David thus has failed to overcome

the strong presumption that his counsel's decision to undermine at Gonzales's identification of

David at trial was not a tactical decision which this Court may not second-guess.  *Richter*, 131 S.

Ct. at 787; *Strickland*, 466 U.S. at 690-91.

David also claims that the police altered the evidence relating to Gonzales's

identification of David and that trial counsel "took no action whatsoever."  At trial, Detective

Nawrock testified that he issued Gonzales an admonishment prior to showing him the six-pack

lineup on January 21, 2004.  Detective Nawrock testified that he misdated that admonishment as

having been given on November 11, 2003.  He testified that David's defense counsel mentioned

the discrepancy at a preliminary hearing, and that the detective subsequently conducted

"immediate[] research," discovered that the error was on his part, and corrected it.  There is no

evidence in the record that the police manufactured evidence or deliberately altered the evidence

to mislead the defense, and accordingly trial counsel was not obligated to raise this speculative

claim as grounds for suppression.  *Wilson*, 185 F.3d at 990; *Lockhart*, 506 U.S. at 374

(O'Connor, J., concurring); *Jones v. Barnes*, 463 U.S. 745, 752 (1983).

  Finally, David argues that trial counsel was ineffective for failing to move for an "*Evans*

Lineup," and that appellate counsel was ineffective for failing ro raise on direct review the claim

that trial counsel was ineffective in this regard.  In *Evans v. Superior Court*,  the California

Supreme Court held that "due process requires in an appropriate case that an accused, upon

timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal

conduct can participate."  522 P.2d 681, 686 (Cal. 1974).  This right arises "only when

eyewitness identification is shown to be in material issue and there exists a reasonable likelihood

of a mistaken identification which a lineup would tend to resolve."  *Id*. (footnote omitted).  The

problem in *Evans* was that the only testifying eyewitness, who saw the defendant through the

backseat of a police vehicle, observing only the back of his head and shoulders, then identified

the defendant as the culprit at a preliminary hearing.  *Id*. at 683.  The defendant requested a

pretrial lineup on the ground that the eyewitness's identification of him at the scene from the

back of the police car was faulty and that the eyewitness would be reluctant to recede from his

position at later proceedings where the defendant appeared in jail clothing.  *Id*.  The trial court

found that the claim had merit but that it lacked the authority to grant the defendant's motion for

such a lineup.  *Id*. at 683-84.  The California Supreme Court reversed, concluding that "[b]ecause

the People are in a position to compel a lineup and utilize what favorable evidence is derived

therefrom, fairness requires that the accused be given the reciprocal right to discover and utilize

contrary evidence." *Id*. at 685.  Evans merely sought to compel the People "to exercise a duty to discover material evidence," including faults or doubts in the eyewitness's identification of him at the scene, which no longer existed after the eyewitness identified him at the preliminary hearing as the culprit. *Id*.  at 686.  "Should [Evans] be denied his right of discovery the net effect would be the same as if existing evidence were intentionally suppressed." *Id*.

Although David claims trial counsel was ineffective for failing to request such a lineup, "the decision of whether to demand a pretrial live lineup is a matter of trial tactics and strategy within counsel's authority to control." *Osumi v. Giurbino*, 445 F. Supp. 2d 1152, 1163 (C.D. Cal. 2006) (quoting *People v. Blomdahl*, 20 Cal. Rptr. 2d 491, 494 (Cal. Ct. App. 1993) (decision by counsel not to pursue his client's request for a live lineup prior to the preliminary hearing was a reasonable tactical decision)).  Here, in contrast to *Evans*, a photo lineup was in fact conducted by the police, and Gonzales could not identify any suspect from the array.  This fact was part of the record and favorable to David, as defense counsel highlighted at trial. Requesting a live lineup would have given Gonzales a second bite at the apple to identify David, and counsel's decision to forgo such a request was reasonable under the circumstances.  Defense counsel instead wisely allowed the initial, favorable photo lineup to stand, and instead painted both the circumstances of the second photo lineup as well as Gonzales's identification from that lineup as suspicious.  David's trial counsel was therefore not deficient in failing to request a live lineup subsequent to the first photo lineup.  *Osumi*, 445 F. Supp. 2d at 1163 ("[P]etitioner's mere speculation is insufficient to overcome the presumption that defense counsel exercised reasonable professional judgment in opting not to seek a pretrial line-up in which [the victim] would have another opportunity to identify petitioner."); *Martinez v. Scribner*, CV 06-01715, 2009 WL 2423100, at *18 (C.D. Cal. Aug. 4, 2009).

Due to the fact that California courts consider whether to request a live lineup a matter of trial tactics, *Blomdahl*, 20 Cal. Rptr. 2d at 494, and trial counsel vigorously undermined Gonzales's identification of David from the second lineup at trial, appellate counsel would not likely have been successful in arguing that trial counsel was ineffective for failing to request such a lineup, *Wilson*, 185 F.3d at 990.  Because one of the main functions of appellate counsel is to "winnow[ ] out weaker arguments on appeal," *Jones*, 463 U.S. at 751, counsel is not required to present every nonfrivolous claim on behalf of a defendant appealing his or her conviction, *see Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citation omitted); *accord Barnes*, 463 U.S. at 754.  David cannot prevail on his claim that appellate counsel was ineffective in this regard.

      4.     Claims related to the lack of African-Americans on the jury (Claims 4, 5, 12, 19, 20 & 21)

David, an African-American, was tried in Trinity County, which he claims is an "extremely rural area" and "99.9% white."  He claims that trial counsel filed a motion for a change of venue because he was "a black charged with killing of a white" and one of his co-defendants had already been convicted in Trinity County.  According to David, there were no African-Americans in the jury pool or on the trial jury.

David raises a host of claims relating to the lack of African-Americans on the jury.  First, he argues that although trial counsel did file a motion for a change of venue, counsel was ineffective because he "did not establish a prima facie case" for relief.  Second, he argues that trial counsel was ineffective for failing to renew the motion for a change of venue after the trial

court dismissed the original motion as premature.  The superior court denied these two claims on habeas review because David failed to support them with record evidence.

In his third claim, David argues that appellate counsel was ineffective for failing to raise on direct appeal "this claim of change of venue and no African-American's [sic] . . . in the trial or jury pool."  Fourth, David claims that the prosecutor impermissibly struck potential jurors on the basis of their race in violation of *Batson*, 476 U.S. at 86.  Fifth, he argues that trial counsel was ineffective for failing to make a *Batson* motion challenging the prosecution's elimination of African-American jurors.  Sixth, he claims that because trial counsel did not make a *Batson* motion, the trial court had a *sua sponte* duty to undertake a "comparative jury analysis" or otherwise question "one of the prosecutor's many peremptory challenges with respect[] to African-American jurors."  David raised these claims for the first time in his exhaustion petition, which the California Supreme Court summarily denied.

Although both parties concede that a motion for change of venue was made by defense counsel at some point and denied by the trial court, neither the motion nor any related hearing is part of the record before this Court.  David has received his trial file and was warned by the superior court that any claims related to the motion for a change of venue needed to be supported by the record, but he has again failed to provide a copy of the motion in support of his Amended Petition.  Respondent states that the motion was not part of the record on appeal and that it could not find any transcripts discussing the motion.  The only evidence in the record of a motion for change of venue is a notice by defense counsel that David joined in Steven's motion for a new trial and motion to dismiss.  In that notice, defense counsel stated that he was adding a claim that the trial court erred in denying the motion for a change of venue.  However, the notice of joinder

fails to provide sufficient information to enable this Court to evaluate David's claims relating to the motion for change of venue.

A petitioner has the burden of establishing that he is entitled to federal habeas relief. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  In an ineffective assistance of counsel claim, a petitioner must show both that counsel's performance was deficient and that counsel's performance prejudiced his defense.  *Strickland*, 466 U.S. at 687.  And in order to show prejudice for failing to file a motion, a petitioner must show that (1) had counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to the petitioner.  *Wilson*, 185 F.3d at 990 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 373-74 (1986)).  A determination of whether defense counsel was ineffective in presenting the motion for change of venue or failing to renew the motion requires consideration of the merits of the motion.  *See Wright v. Hedgpeth*, No. CIV S-09-3347, 2012 WL 1194853, at *30 (E.D. Cal. Apr. 10, 2012).  Because David did not cite to the record or otherwise present support for his claim, his claim is rejected.  David has failed to meet his burden of showing what was and was not done by counsel so that this Court can meaningfully review his claim, and this Court may not speculate about deficiencies in counsel's representation.  Allegations such as this one which are not supported by reference to the record or any document fail to meet the requirement of Habeas Corpus Rule 2(c) that a petitioner "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."  *Mayle*, 545 U.S. at 655-56; *Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011); *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995); *see also Premo v. Moore*, 131 S. Ct. 733, 741-42 (2011).

David next argues that the prosecution impermissibly struck African-American jurors in violation of *Batson*, 476 U.S. at 86, that trial counsel failed to make a *Batson* motion in response to those race-based challenges, and that the trial counsel failed to *sua sponte* conduct a comparative juror analysis in response to the prosecution's challenges.  The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the jury.  *Batson*, 476 U.S. at 86.  In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination. *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

To establish a *prima facie* case of discrimination under *Batson*'s first step, the defendant must show that: 1) the prospective juror is a member of a cognizable racial group; 2) the prosecutor used a peremptory strike to remove the juror; and 3) the totality of the circumstances raises an inference that the strike was on account of race.  *Batson*, 476 U.S. at 96; *Crittenden v. Ayers*, 624 F.3d 943, 955 (9th Cir. 2010).  The prosecutor's use of a peremptory strike to remove an African American juror satisfies the first two prongs of the inquiry; the question would then become whether the totality of the circumstances raises an inference that the strike was used on account of race.

David has again failed to support his claim that the prosecution made impermissible race-based challenges to potential jurors.  In fact, his claim that such challenges occurred is belied by the record as well as his assertions in other portions of his Amended Petition.  According to

David, there were no African-Americans in the jury pool whatsoever due to the fact that the county was largely Caucasian. His statement is supported by the above-mentioned notice of joinder, in which defense counsel argued that although two hundred and forty prospective jurors were summoned, not one of them identified themselves in the juror questionnaire as African-American or partly African-American. David's statement is also supported by Steven's defense counsel's statement during summation that Trinity County was "two percent black, if that." The prosecution could not have impermissibly stricken jurors on their classification as African-Americans where there were none in the jury pool, and thus there would not have been any basis for defense counsel to raise a *Batson* motion to otherwise conduct a comparative juror analysis.

Construing David's claim liberally, *Erickson*, 551 U.S. at 94, he appears to argue that he was entitled to a trial jury that included African-Americans. Although a petit jury "must be drawn from a source fairly representative of the community," a criminal defendant is "not entitled to a jury of any particular composition." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *see also Powers v. Ohio*, 499 U.S. 400, 404 (1991) (although a criminal defendant has the right to be tried by a jury whose members are selected by non-discriminatory criteria, a defendant does not have a right to a right to a petit jury composed in whole or part of persons of the same race). The "point at which an accused is entitled to a fair cross-section of the community is when the names are put into the box from which the panels are drawn." *Lockhart v. McCree*, 476 U.S. 162, 174 (1985) (citation omitted). The Constitution only requires that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538. In order to prevail on this claim, David would have to demonstrate that the manner of selecting the jury panels systematically excluded distinctive

groups.  *See id.*  David has not pointed to any evidence of systematic exclusion of African-Americans from the jury pool; rather, it appears that the lack of African-Americans in the venire was a result of the fact that, as David notes, there are very few African-Americans in Trinity County.  Moreover, David has failed to allege any factual basis for concluding that his trial jury was anything but impartial.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (the Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors").  David is therefore not entitled to relief on any of his claims related to the lack of African-Americans seated on his trial jury.

> 5.      Refusal to allow him to testify (Claim 6)

David next argues that his trial counsel was ineffective for refusing to allow him to testify at trial.  David argues that he "repeatedly" requested prior to and throughout trial that defense counsel allow him to testify.  David claims that trial counsel mistakenly informed the court that he did not want to testify.  He further argues that defense counsel and a private investigator "double-teamed" him into declining to testify.  David raised this claim in his petition to the superior court for habeas review, which the superior court denied on the ground that David had failed to support it with record evidence.  David also raised this claim in his petitions to the California Court of Appeal and Supreme Court, and both appellate courts summarily denied relief.

After the prosecution had concluded its case-in-chief and defense counsel had called several witnesses, the following exchange took place in chambers:

> [Defense counsel]:      This is just to make a record that I have discussed with my client his opportunity to testify on his own behalf and the contrary, his Fifth Amendment right not to testify.  And we've spoken about it numerous times, both the investigator and myself, and as of last night, after court, we went to the jail and talked extensively, and I

|              | believe that my client is going to testify.  But I just wanted to make a record that both my investigating officer and I have talked to him about the pros and cons of testifying and that essentially it is his decision to make.  And that's all I need to say. |
| --- | --- |
| The court: | Do you have any questions, [David]?  Do you understand what your attorney has told you?  There is no lingering issues out there that are unanswered for you, for the evidence so far.  And you understand the prosecution has the right to cross-examine you fully if you testify? |
| [David]: | Yes. |
| The court: | And it may very well have been your attorneys [sic] advice not to.  That's what I'm presuming from what I heard so far. |
| [David]: | I just want to say I'm still not certain if I want to or not. |
| The court: | Okay. |
| [David]: | I'm not sure.  If I feel like I need to, I will. |
| The court: | That's still a decision for you to make.  This is just a record to show that you have been advised by counsel and your investigator what they believe you should or shouldn't do, and you are informed that's your choice. |
| [David]: | (Nods). |

At the conclusion of evidence, the court asked defense counsel if he had any further witnesses, to which defense counsel replied, "I don't believe that we will be calling anymore [sic] witnesses."  David did not assert his desire to testify.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted); *Jones*, 229 F.3d at

120.  The right to present a defense includes "an accused's right to present his own version of events in his own words."  *Rock v. Arkansas*, 483 U.S. 44, 52 (1987); *In re Oliver*, 333 U.S. 257, 273 (1948).

It is possible that defense counsel and his investigator did, in fact, advise David off the record that it was against his interests to testify.  On the one hand, a tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  On the other hand, "it cannot be permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice," *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002), because "a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense," *Rock*, 483 U.S. at 49.  A defendant may, however, waive this right, either explicitly or implicitly.  *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999).  Such a waiver may be inferred from a defendant's failure to testify at trial or to notify the trial court of his desire to testify.  *See id.* at 1094-1095.  "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify," unless he "reject[s] his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).  California law is in accord.  *People v. Alcala*, 842 P.2d 1192, 1231 (Cal. 1992).

Here, David has failed to demonstrate that counsel rendered prejudicially ineffective assistance by advising him to waive his right to testify.  The record indicates that David was advised that it was his right to testify, indicated that he was still undecided, and never affirmatively asserted his right to testify.  While David may now wish, with the benefit of

hindsight, that he had testified at trial, the record reflects that he voluntarily waived that right.

David is therefore not entitled to federal habeas corpus relief on his claim that trial counsel

prevented him from testifying.

> 6.      Transported in shackles (Claim 7)

David next argues that he was transported to court each day in a police vehicle wearing a

suit but "visibly shackled."  The superior court denied this claim on the merits on habeas review,

concluding as follows:

> [David] apparently seeks relief based on his claim that he was transported and
> forced to appear at court appearances prior to trial wearing a jail jumpsuit and shackled,
> citing *People v. Duran* (1976) 16 C 282 and *Estelle v. Williams* (1976) 425 U.S. 501.
> [David's] authority does not support his claim for relief; *People v. Duran* (citation is 16
> C3d 282) addresses the issue of shackling at trial in the presence of jurors.  [David]
> makes no statements that can be understood to be a claim, nor any documents that may
> support a claim, that [he] was unlawfully restrained at trial, or at any other evidentiary
> hearing.  *Estelle v. Williams* addresses the issue of a defendant compelled to stand trial
> dressed in prison clothing; again the Petition does not claim that [David] was compelled
> to stand trial dressed in jail or prison clothing.


The California Court of Appeal and Supreme Court summarily denied relief on this

claim.

According to the trial record, on February 6, 2006, John Webster, David's co-defendant's

counsel, inquired as to what security measures would be in place:

> [Mr. Webster]:          Your Honor, I just had some questions about having not done a
>                         criminal trial in this county before about what security measures
>                         would be like for these two gentlemen and what the court layout is
>                         anticipated to be.  I figure next time we're going to be here there is
>                         going to be jurors present.
>
> The court:              I presume.  Counsel has or will obtain street clothes for their
>                         clients?
>
> [David's counsel]:      Yes, sir.

| | |
|---|---|
| [Mr. Webster]: | Not a problem. |
| The court: | Taken to the jail and be dressed in those.  They'll be transported and brought in a door that's not usually used by the jurors.  It's possible the juror [sic] will find out they're in custody.<br>As long as they're not sitting here with orange on I think that's really the best we can hope for.  We're going to try to avoid at all costs the jury finding out that they are in custody, you know, we're reasonable about it anybody charged with a murder case is usually not free on bail. |
| [David's counsel]: | I think what counsel is going to is some of the details, are they going to be chained? |
| The court: | They'll have electronic stun belts on. |
| [Mr. Webster]: | Does the county have two of them? |
| The court: | Different frequencies I hope. |

On March 8, 2006, during the prosecution's case-in-chief, Mr. Webster made a request

outside the presence of the jury:

| | |
|---|---|
| Mr. Webster: | I had a couple of issues.  One is that it seems that every morning, as the jurors are gathering, a lot of them go outside to smoke around here, and then the officers bring my client, and assuming Mr. David Jones, through the parking lot in order to get back over here.  I'm wondering if they couldn't just go - - so half a dozen jurors saw my client this morning being hauled over.  It seems they could go another block and turn around. |
| The court: | The Acting Marshall talked to me about that this morning, and it was drive another block, or tell the jurors they can't smoke.  And I told him just to tell the transport officer to go ahead and drive them all the way up - - it's not all the way - - to the hospital come around the full block, so they don't go through the parking lot. |
| Mr. Webster: | That would probably do it.  Thank you. |

Finally, on March 29, 2006, as counsel and the court were settling jury instructions, the court inquired, "Physical restraints, have they been noticeable?"  David's counsel responded, "I don't believe so."

The Sixth and Fourteenth Amendments to the United States Constitution assure a criminal defendant the right to a fair trial.  *See Estelle v. Williams,* 425 U.S. 501, 503 (1976). Visible shackling of a criminal defendant during trial "undermines the presumption of innocence and the related fairness of the factfinding process" and "'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'"  *Deck v. Missouri,* 544 U.S. 622, 630-31 (2005) (quoting *Illinois v. Allen,* 397 U.S. 337, 344 (1970)); *see also Larson v. Palmateer*, 515 F.3d 1057, 1062 (9th Cir. 2008).  The Supreme Court has therefore held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  *Deck,* 544 U.S. at 629.  Those interests include "physical security, escape prevention, [and] courtroom decorum."  *Id.* at 628.  Accordingly, criminal defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest."  *Ghent v. Woodford,* 279 F.3d 1121, 1132 (9th Cir. 2002); *see also Jones v. Meyer*, 899 F.2d 883, 884 (9th Cir. 1990); *Wilson v. McCarthy,* 770 F.2d 1482, 1484 (9th Cir. 1985).

Ordinarily, however, only the shackling of a defendant in the courtroom during trial when the trial court prejudicially failed to comply with established safeguards to ensure that only the least restrictive alternatives are used in response to a compelling need concerns federal habeas courts.  *See Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (per curiam) (finding prejudice from a concededly unconstitutional shackling of the defendant during her trial where

the record was devoid of evidence that the trial court made attempts to conceal the defendant's restraints in the courtroom during the trial); *see also Rhoden v. Rowland,* 172 F.3d 633, 637-38 (9th Cir. 1999) (finding a defendant was prejudiced because the jury saw him shackled throughout the entire trial); *Spain v. Rushen*, 883 F.2d 712, 728 (9th Cir. 1989) (finding a due process violation when the trial judge failed to consider the less restrictive means of exclusion from trial before imposing on the defendant shackling of "unparalleled" extent and duration).

Here, David was not visibly shackled at trial, but was apparently transported to the courthouse in shackles.  The state arguably had an essential interest in shackling during transportation to the courthouse a defendant on trial for murder in order to prevent the defendant's escape and maintain physical security of the police and the public during transportation.  *Deck*, 544 U.S. at 628.  Once counsel notified the court that some members of the jury who were smoking outside might have seen the police vehicle arrive, the court took immediate measures to change the transportation route so that both the state's interests and David's due process rights would be protected.  It is not clear if any of the jurors who were smoking outside actually saw David in shackles through the window of the police vehicle. Counsel for David's co-defendant merely mentioned several jurors might have seen the co-defendant being "hauled over," but there is no evidence they actually saw either defendant in shackles.  In fact, David's counsel represented during the settling of jury instructions that he did not believe that physical restraints had been visible to the jury.

Nevertheless, even if a few members of the jury saw David shackled through the window of the police vehicle in the mornings while they were outside smoking, the Ninth Circuit has held that a few jurors' brief glimpses of a defendant in shackles or handcuffs outside of the courtroom do not amount to a due process violation warranting federal habeas relief.  *See Ghent*,

-47-

279 F.3d at 1132 (no actual prejudice where "a few jurors at most glimpsed [the petitioner] in shackles in the hallway as he was entering the courtroom"); *United States v. Olano,* 62 F.3d 1180, 1190 (9th Cir. 1995) ("a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant"); *see also Castillo v. Stainer,* 983 F.2d 145, 147-48 (9th Cir. 1992) (finding no due process violation when some members of the jury pool saw the defendant in shackles in a court corridor, and that although the court committed constitutional error by permitting shackling during trial without weighing that burden against less restrictive alternative, the error was harmless).  The superior court's denial of relief on this claim was therefore neither unreasonable nor contrary to federal law, and David accordingly cannot prevail on this claim.

       7.        Prosecutorial misconduct (Claim 8)

David next argues that the prosecutor "did not even try to camouflage . . . misconduct when it was mentioned, not once, not twice, not three time, but five times in closing that [David] did not even take the stand in his own defense" and that his defense counsel failed to object or request a curative instruction.  David raised this claim in his petition to the superior court, and the superior court denied relief on the ground that he failed to support his claim with reasonably available documentary evidence.  David also raised this claim in his petitions for habeas relief to the California Court of Appeal and Supreme Court; both appellate courts summarily denied relief.

The Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such evidence is evidence of guilt."  *United States v. Robinson*, 485 U.S. 25, 30 (1988) (citation omitted).  That is, the judge and prosecutor are prohibited "from suggesting to the jury that it may treat the defendant's silence as substantive

evidence of guilt." *Id*. at 32 (citation omitted).  However, not every reference by a prosecutor to a defendant's failure to testify violates the Fifth Amendment.  Rather, where "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, . . . there is no violation of the privilege [against compulsory self-incrimination]." *Id*.  "It is one thing to hold . . . that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence." *Id*. at 34.

David does not identify the specific comments by the prosecution which he finds objectionable.  A review of the record indicates that the prosecutor did not make any comments during his initial closing argument that referenced David's decision to not testify.  After counsel for Steven and David gave their respective closing arguments, the prosecution gave a rebuttal closing argument in which he noted defense counsels' failure to present evidence or call witnesses to testify or "explain" certain aspects of their theories of the case.  The prosecutor's comments did not, however, violate David's Fifth Amendment rights.  The Ninth Circuit has expressly held that "[p]rosecutors may comment on the failure of the defense to produce certain evidence to support an affirmative defense so long as it does not directly comment on the defendant's failure to testify."  *Cook v. Schriro*, 538 F.3d 1000, 1020 (9th Cir. 2008).  None of the prosecutor's comments in this case can reasonably be construed as a direct comment on David's failure to take the stand or a suggestion that his silence was indicative of guilt, and accordingly there was nothing to which his counsel should have objected.

8.      Failure to request theft instruction (Claim 9)

David next argues that he lacked the specific intent to commit a robbery, and that his counsel was ineffective for failing to request that the jury be instructed that theft is a lesser included offense of robbery.  David raised this claim in his habeas petitions to the California Court of Appeal and Supreme Court.  Both appellate courts summarily denied relief.

David's claim is plainly contradicted by the record.  His defense counsel did request instructions on grand theft and petty theft as lesser included offenses of robbery, and the court instructed the jury on those offenses.  Moreover, his counsel's theory of the case was that David committed theft, not robbery, and should not be liable for anything more.  In summation, defense counsel argued that the taking of the marijuana did not amount to a robbery because it was not "accomplished by means of force and fear."  Rather, defense counsel conceded that whoever stole the marijuana had committed theft, and argued that the Gonzales and Jarvis then "escalat[ed] the violence" by ramming their truck into the Taurus that Steven and David had absconded in.  According to defense counsel, Gonzales could have been charged with attempted murder and the shooter killed Jarvis in self-defense.  David's counsel therefore requested the instruction, the instruction was given, and counsel actively advocated that David's actions amounted to a theft rather than a robbery.  David's claim that counsel did anything less is completely without merit.

9.      Allegations based on an "actual breakdown" in his relationship with counsel
        (Claims 10-12, 16)

David claims that there was "an actual breakdown in the adversarial process" and he is entitled to a presumption of prejudice because: 1) defense counsel exhibited a "wholesale lack of meaningful representation"; 2) defense counsel "clearly took advantage of a position of trust"; 3)

defense counsel was "psychologically disoriented," "appeared to experience blackouts," and had "memory lapses"; 4) the trial and appellate courts failed to grant him an evidentiary hearing concerning his trial counsel's "failure to assure a race-neutral jury"; 5) defense counsel failed to file a motion to sever; and 6) defense counsel took no action with respect to "the issue of mistaken identification and prosecutions [sic] willingness to alter known court documents." David raised these claims for the first time in his exhaustion petition, which the California Supreme Court summarily denied.

In *United States v. Cronic*, 466 U.S. 648 (1984), which was decided on the same day as *Strickland*, the Supreme Court "recognized a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon,* 543 U.S. 175, 190 (2004) (discussing *Cronic*). *Cronic* held that a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial," *Bell v. Cone,* 535 U.S. 685, 695 (2002), when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *Cronic,* 466 U.S. at 658. *Cronic* identified several such situations, including: 1) the complete denial of counsel at a critical stage of trial; 2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; 3) where counsel labors under a conflict of interest that affects his performance; and 4) also "on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." 466 U.S. at 658-60. Under such circumstances, no specific

showing of prejudice is required because "the adversary process itself [is] presumptively unreliable." *Id.* at 659.  But apart from circumstances of this magnitude, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 659 n.26.

 As an initial matter, David's claims that counsel exhibited a "wholesale lack of meaningful representation," "clearly took advantage of a position of trust," and experienced blackouts or was otherwise disoriented are not supported by a statement of specific facts.   David carries the burden of proving that he is entitled to relief on this claim.  *Pinholster*, 131 S. Ct. at 1398.  Again, Habeas Corpus Rule 2(c) requires that a petitioner "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."  *Mayle*, 545 U.S. at 655.  Conclusory allegations such as this one which are not supported by a statement of specific facts do not warrant habeas relief.  *Greenway*, 653 F.3d at 804.  David has failed to assert any specific facts—such as particular instances when counsel blacked out or appeared inebriated—which would support his claim and enable this Court to meaningfully review his assertions.  Accordingly, he cannot prevail on these claims.

 David's remaining claims—that counsel failed to secure a "race-neutral" jury and that he was not granted an evidentiary hearing on that ground, that counsel failed to move to sever his trial and failed to take action with respect to his claim that the police altered evidence—amount to disagreement with trial tactics rather than a wholesale deprivation of counsel which would defy particularized analysis and necessitate reversal regardless of whether prejudice is shown. For prejudice to be presumed, counsel's failure must be complete, which is not the case here. *See Bell*, 535 U.S. at 696-98.  This Court must therefore apply *Strickland* rather than *Cronic* to David's remaining ineffective assistance of counsel claims.

Even under the *Strickland* standard, David's claims must fail.  It is not clear what more counsel could have done to secure a "race-neutral" jury in a county which was largely Caucasian.  And again, David has not attached a copy of the motion for change of venue or transcripts of the hearing which would allow this Court to determine if counsel was ineffective in presenting that motion or evaluate what more reasonable counsel should have done.  As already discussed *infra*, there was no evidence that the police deliberately altered evidence, and counsel was not deficient for failing to raise this speculative claim.  Lastly, contrary to David's assertion, counsel did file a motion to sever David's trial from Steven's trial.  In sum, David cannot establish that his counsel's performance was deficient, much less prejudicial, and this Court therefore rejects his remaining claims under *Strickland*.

        10.       Insufficient evidence (Claim 14)

David next argues that there was insufficient evidence to find him guilty of attempted murder because he did not take any sort of "direct step" toward killing anyone and he did not harbor the specific intent to kill.  He raised this claim for the first time in his exhaustion petition to the California Supreme Court, which that court summarily rejected.

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or

considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

David's argument is misguided because the jury was not required to find that he took a step toward killing another person or harbored the specific intent to kill in order to find him guilty of attempted murder.  One of the theories of liability the prosecution proceeded on was that David was liable for attempted murder because he aided and abetted one of the target crimes, which included robbery, and the attempted murder was a natural and probable consequence of that target crime.  The court charged the jury that a person aids and abets the commission or attempted commission of a crime when he, "with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of encouraging or facilitating the commission of the crimes, and by act or advice aids, promotes, encourages, or instigates the commission of the crime."  A jury could have found that David harbored the intent to facilitate the robbery where he grabbed the bag of $12,000 worth of marijuana, jumped into the moving Taurus, and his cohort fired at Jarvis and Gonzales as they chased after their property.  A jury could have also reasonably concluded that where one of his friends used a firearm to effectuate that robbery by shooting at Jarvis and Gonzales as they attempted to run down the Taurus that it was reasonably expected that the cohort would also use the firearm to attempt to kill them.  Thus, a rational jury could have found David guilty of attempted to murder in that he intended to aid and abet in the robbery, and that the attempted murder of Gonzales was a natural and probable consequence of the nature of the robbery.

11.     Counsel's failure to investigate and introduce evidence at trial (Claim 15)

David next argues that his trial counsel failed "to investigate and introduce at trial evidence central to [his] defense."  David also claims that his trial counsel failed to call witnesses and present impeachment evidence and conducted "perfunctory cross-examination" of the witnesses for the prosecution.  To the extent David continues to complain of his counsel's conduct with respect to Gonzales's identification of him from the second photo array, his claims have already been addressed.  To the extent David is referring to other, unaddressed complaints with counsel, he has failed to raise any discernable claim.  Rather, David's arguments are vague and conclusory and unsupported by a specific statement of facts.  As already mentioned, "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  *Greenway*, 653 F.3d at 804 (9th Cir. 2011) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  With respect to his claim that counsel failed to call certain unidentified witnesses, the ultimate decision not to call witnesses to testify is well within counsel's "full authority to manage the conduct of the [proceeding]."  *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision . . . to decide not to put certain witnesses on the stand . . . ."); *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."). Moreover, David has not identified who should have been called and what they would have testified to.  *See Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000) (rejecting petitioner's claim that counsel was ineffective for failing to call alibi witnesses where there was no evidence that the witness existed and the petitioner provided no evidence that the witness would have provided helpful testimony for the defense).  David therefore cannot prevail on these claims.

12.     Additional instructional errors (Claims 18, 22 & 23)

David makes several instructional error claims.  In Claim 18, he argues that the omission of certain unidentified "lesser-included offense and specific intent element instructions" violated his right to due process.   In Claim 22, he argues that his trial counsel was ineffective for failing to request CALJIC jury instructions 2.51, 3.35, 3.36, 8.45, 8.46, and 8.51.  In Claim 23, he argues that the trial court failed to *sua sponte* instruct the jury on involuntary manslaughter and criminal negligence.  The California Supreme Court summarily rejected these claims on habeas review.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  *Id*. at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  *Id*. at 73.  Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire

trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at

72.

Contrary to David's assertion, the court did instruct the jury on CALJIC 2.51 ("Motive"),

the elements of various lesser included offenses of murder, attempted murder, and robbery, and

the specific intent requirement for certain crimes, lesser included offenses, and special

circumstances.  David's assertion that counsel was ineffective for failing to request an instruction

on involuntary manslaughter (CALJIC 8.45) is belied by the record.  Defense counsel for both

Steven and David discussed the possibility of an instruction on involuntary manslaughter on the

ground that the shooter intended to miss, thus only firing warning shots.  The court stated, "I'm

not going to go for that [theory]," and declined to so instruct the jury.  In addition, David's claim

that counsel was ineffective for failing to request CALJIC 8.51 is somewhat misplaced.  The

court did give CALJIC 8.50, which discusses the distinction between murder and manslaughter.

CALJIC 8.51 discusses the difference between murder and involuntary manslaughter.  Because

the court had already declined to charge the jury with involuntary manslaughter, any instruction

on the distinction between murder and involuntary manslaughter would have been unnecessary

and confusing to the jury.  This Court will not deem counsel deficient for failing to request a jury

instruction on a theory of liability already rejected by the trial court.  *Lockhart*, 506 U.S. at 374

(1993) (O'Connor, J., concurring). (failing to raise a meritless objection cannot constitute

prejudice under a *Strickland* ineffective assistance of counsel claim).

David additionally argues that his trial counsel was ineffective for failing to request three

instructions on criminal negligence—CALJIC 3.35 ("Concurrence of Act and Criminal

Negligence"), CALJIC 3.36 (Criminal or Gross Negligence—Defined"), and CALJIC 8.46

("Due Caution and Circumspection—Defined").  The court and counsel for all three parties

discussed CALJIC 3.35 and 3.36 on three occasions.  On the third and final occasion it was

discussed, which occurred while the court was charging the jury, the court noted that CALJIC

3.35 was repetitive of the "general criminal intent instruction" which had already been given,

and asked "where does the criminal or gross negligence come in?"  David's defense counsel

argued that it could be considered criminally negligent to shoot into an occupied vehicle, and

that criminal or gross negligence could also support a first degree murder finding.  The court

reserved its ruling, stating:

> [T]here is so much repetition.  [CALJIC 3.36] hasn't been stated in what I've read
> so far, so I'll look at what we have left.  If it's not contained elsewhere within what's
> remaining, we'll add it in where it is.  If it's redundant, we won't.

The court never ultimately ruled on whether it would instruct the jury on CALJIC 3.36,

and neither parties brought this oversight to the court's attention.  CALJIC 3.36 was not included

in the packet of jury instructions submitted to the jury.  Nevertheless, David's claim that counsel

failed to advocate for criminal or gross negligence instructions is contradicted by the record.

He also claims, however, that the court erred in failing to charge the jury on involuntary

manslaughter and criminal negligence as lesser included offenses.  David's claim must fail,

however, because the United States Supreme Court has expressly declined to decide whether due

process requires lesser included instructions to be given in non-capital cases, *Beck v. Alabama*,

447 U.S. 625, 638 n.14 (1980), and the Ninth Circuit has declined to extend the holding of *Beck*,

which requires lesser included offense instructions supported by the evidence in capital cases, to

non-capital cases, *see Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (the "failure of a state

court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional

question and will not be considered in a federal habeas corpus proceeding" (quoting *Bashor v.

Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  Although a criminal defendant may suffer a due

process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case, *Bashor*, 730 F.2d at 1240, David makes no such argument here. Defense counsel did not proceed on a theory that David might be found guilty of criminal negligence or involuntary manslaughter rather than murder.  Rather, he argued that although a theft was committed, the owners of the marijuana reacted disproportionately and that David and his cohorts engaged in justifiable self-defense.  Given the absence of Supreme Court authority on this issue, this Court cannot say that the California Supreme Court's summary rejection of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Musladin*, 549 U.S. at 77 (brackets and internal quotation marks omitted).

       13.      Cumulative error (Claim 24)

David lastly argues that his "conviction should be reversed upon the cumulative effect of errors committed at [his] trial."  David raised this claim for the first time in his exhaustion petition, which the California Supreme Court summarily rejected.

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in determining the jury's verdict."  *Brecht*, 507 U.S. at 623 (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far

less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

As discussed above, David does not allege any claims that amount to errors of constitutional dimension. Accordingly, he demonstrates no errors that can accumulate to a level of a constitutional violation, and the California Supreme Court therefore did not unreasonably deny him relief on this claim. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

## V. CONCLUSION AND ORDER

David has raised numerous issues in his *pro se* Amended Petition culled from case law which, as discussed in this opinion, either find no support in the holdings of the United States Supreme Court or, if supported by case law, are unsupported or even contradicted by the record. David, therefore, is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

      Dated: August 15, 2014.

                      /s/James K. Singleton, Jr.
                      JAMES K. SINGLETON, JR.
                      Senior United States District Judge